United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN YOUNG,<br><br>    Plaintiff,<br><br>v.<br><br>DANIEL CANCILLA, et al.,<br><br>    Defendants. | Case No. 18-cv-01931-DMR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 41 |

Defendants Daniel Cancilla and Steven Humrich move for summary judgment on all of Plaintiff Steven Young's claims. For the reasons stated below, the court grants the motion as to the *Monell* claim and state tort claims and denies the motion as to the claims under 42 U.S.C. § 1983.

**I. FACTUAL BACKGROUND**

Both parties offer scant evidentiary support to establish the basic facts of this case. Young submitted his own declaration and one from his friend Leo Woodard ("Leo")[1], a nonparty witness. Defendants submitted a declaration from Cancilla, and as part of their reply brief, a portion of the police narrative written by Cancilla and some of the other officers involved in the underlying incident. Although Defendants submitted a paper titled "Separate Statement of Undisputed Facts," the three-page submission is argumentative and full of "facts," many of which are clearly disputed. Neither side submitted evidentiary objections.

As it is difficult to construct a single coherent narrative from the parties' combined submissions, the various versions of the facts are separately recounted below.

---

[1] The court uses "Leo" rather than "Woodard" in order to distinguish this witness from Earnest Woodard, who is referred to as "Earnest" for the same reason.

### A. Young Declaration

According to Young, on May 2, 2017, he was at 2250 Menalto Avenue in East Palo Alto ("Subject Property"), which is the residence of his friend, Leo. [Docket No. 43-3 (Young Decl.) ¶ 2.] Around 1:00 p.m., he was sitting on a bench outside the house and using a straight razor to cut corns from his toes. Decl. ¶ 3. Two police officers came through the gate onto the property,[2] one of whom he recognized as Cancilla from his previous interactions with that officer. *Id.* ¶¶ 3-4. Young claims that he has filed "at least three or four complaints" against Cancilla based on the officer's "harassment and aggressive behaviors" toward him in prior encounters. *Id.* ¶ 5. Young asked Cancilla if he had a warrant to enter the property, and Cancilla replied that he was there to conduct a probation search on Raymond Lee Scott ("Scott"). *Id.* ¶ 7. Young informed Cancilla that no such person lived there. *Id.* ¶ 8. Cancilla then asked to speak with the owner of the house, and Young called to Leo, who came out of the house and asked the officers why they were there. *Id.* ¶ 9. The officers informed Leo that they were conducting a probation search on Scott, and Leo informed them that no one by that name lived at the property nor had ever lived there. *Id.* ¶ 11.

Young then noticed that there were some other "drug enforcement officers" coming onto the property; they claimed there was some "commotion" going on in the back yard, and they ran toward the back yard. Young Decl. ¶ 12. Cancilla and Humrich then ran toward Young and asked him if he had any weapons. *Id.* ¶¶ 13-14. Young stated that he did not have a weapon other than the straight razor blade that he was using to cut corns from his toes, which he handed to Cancilla while he was still sitting down. *Id.* ¶ 15. Cancilla asked if he could pat search Young, and Young refused because he "had done nothing wrong and was not the subject of [Cancilla's] intrusion into the property." *Id.* ¶ 16. Cancilla then grabbed Young's left hand, twisted his wrist, and forcibly slammed him onto the concrete floor. *Id.* ¶ 17. Young landed on his back and offered no resistance although Cancilla continued to twist his left hand. *Id.* ¶¶ 18-19. Cancilla then "kneeled on [Young's] spine with all of his weight," and Humrich grabbed Young's right arm to twist it violently. *Id.* ¶ 19. Cancilla then started to hit Young in the face and the back of the head with his

---

[2] None of the declarations or the police narrative clarify the identity of the second officer who initially entered with Cancilla.

elbow and a closed fist. *Id.* ¶ 20.

When Young asked what he had done wrong, Cancilla responded that he was taking Young to jail for resisting arrest, assault and battery on a police officer, and possession of crack cocaine. *Id.* ¶ 22. Young claims that he never resisted any of the officers, never used force against any of them, and at no time had crack cocaine on his person. *Id.* ¶¶ 23-25. Young was then placed in a police vehicle and transported to an emergency room where he was treated for injuries to his face and body. *Id.* ¶ 27; Docket No. 43-3, Ex. A (Emergency Room Records). After he left the hospital, he was taken into custody in the Redwood City Jail and booked on charges of resisting arrest and assault and battery on a police officer. *Id.* ¶ 28.

### B. Leo Declaration

Young also submitted a declaration from Leo. [Docket 43-2 (Leo Decl.)]. Leo is the owner of the Subject Property and she was present at the house during the incident on May 2, 2017. Leo Decl. ¶ 3. She states that around 1:00 p.m., two police officers "came busting through [her] gates." *Id.* ¶ 4. At the time, she was sitting inside on a couch by her front door and could see the officers enter the property. *Id.* ¶ 5. The officers entered her home and ordered her, her two grandsons, and her son's girlfriend Brenda to get out of the house and into the yard. *Id.* ¶ 6. They all complied. *Id.* ¶ 7. The officers entered her home and began taking pictures and searching the house. *Id.* ¶ 10. None of them produced a warrant for the search. *Id.* ¶ 11. She saw one of the officers grab Young's hand and throw him to the pavement outside. *Id.* ¶ 12. She also saw that same officer kneel on Young's back and punch him with a closed fist and hit him with an elbow on the back of his head as Young was laying facedown on the concrete. *Id.* ¶ 13. She also observed Young's subsequent arrest. *Id.* ¶ 14.

### C. Cancilla Declaration

Cancilla testifies that he has routinely patrolled the 2200 block of Menalto Avenue for approximately a year, due to "numerous complaints from citizens advising the street is a common place for people to loiter with intent to buy or use illegal substances." [Docket 41-5 (Cancilla Decl.) ¶ 2.] He knows from his experience working as a police officer in the City of East Palo Alto that the block is a "common area for narcotic related crimes." *Id.* He claims that on May 2, 2017, around

3

1    11:00 a.m., he conducted a probation search on the "owner" of the Subject Property, Raymond Scott.
2    *Id.* ¶ 3.

3    He "made contact" with Young, who was sitting on a couch in front of the house. *Id.* ¶ 4.
4    Cancilla claims that Young was "agitated" and was holding a straight razor blade. *Id.* Cancilla
5    testifies that, fearing for his safety and the safety of the other officers at the scene, he grabbed
6    Young's left hand in an attempt to get him to stand. *Id.* ¶ 5. Young attempted to punch Cancilla
7    with his right hand, although Cancilla was able to dodge and catch Young's right wrist. *Id.* Cancilla
8    was then able to force both of them to the ground, with himself on top of Young. *Id.* He attempted
9    to place handcuffs on Young, but Young kept pulling his arm away. *Id.* Humrich held Young's
10   legs in place, and other officers assisted Cancilla and Humrich in detaining and eventually arresting
11   Plaintiff. *Id.* Cancilla claims that he then searched Young and found rock cocaine base and
12   $4,301.00 in Young's possession. *Id.* ¶ 6.

### D. Police Narrative

Defendants also submit a copy of the police narrative from the May 2, 2017 incident.
[Docket 47-1, Ex. A (Rep.).] The narrative contains statements from Cancilla and Humrich, as well
as other officers on the scene: Loren Wutzke, Jose Luaorozco, and Robert Weigand. Cancilla's
narrative states that Cancilla had seen Scott at the Subject Property the day before Young's arrest
and knew that Scott was on probation. Rep. at 4. Scott's probation address was listed as the address
of the Subject Property. *Id.*

On May 2, 2017, prior to conducting the probation search on Scott, Cancilla contacted six
other officers to assist with the probation search: Officers Humrich, Wiegand, Wutze, and
Luaorozco from the East Palo Alto Police Department, and Sgt. Soares and Officer Mendoza from
the Menlo Park Police Department. *Id.* at 4-5. They all arrived at the Subject Property around 12:07
p.m. *Id.* Soares and Mendoza saw Earnest Woodard ("Earnest") standing on the east side of the
property. *Id.* at 5. Earnest began to run away from the officers and threw an object in the back yard.
*Id.* Wutzke found the discarded item and arrested Earnest. *Id.* After the detention and arrest of
Young as described above, Wutzke placed Young in the back of his patrol vehicle with Earnest. *Id.*

After Young was handcuffed, Cancilla states that he saw a small, off-white rock fall out of

4

Young's right hand, which he believed was rock cocaine base. *Id.* at 6. He collected the white rock and booked it as evidence, although there is no statement from anyone that the substance was ever tested and confirmed as cocaine. *See id.* However, the object thrown away by Earnest was a plastic bag containing a substance that was later tested and confirmed to be rock cocaine base. *Id.* The police also found another bag (presumably also thrown away by Earnest, although it is not clear from the narratives) containing approximately 4 grams of black tar heroin. *Id.*

Cancilla states that he called Chris Gale from the City of East Palo Alto Code enforcement and requested that he come to the Subject Property to confirm that it was in compliance with city building codes. *Id.* at 7. Gale walked through the house and determined it was unsafe to live in. *Id.* He "red-tagged" the building, giving all residents 72 hours to vacate the building. *Id.*

Humrich's narrative states that he responded to Cancilla's call for assistance with a probation search. Rep. at 9. He says that when he arrived on the scene, he stood outside the front gate and observed other officers from the East Palo Alto and Menlo Park Police Departments enter the residence and back yard of the residence. *Id.* He recognized Young from previous encounters, and saw Young sitting on what "appeared to be a bench seat from a vehicle." *Id.* Humerich heard Cancilla tell Young that he needed to be searched for weapons. *Id.* Young refused, Cancilla grabbed his left hand, and Young then attempted to strike Cancilla. *Id.* Once Cancilla pushed Young to the ground, Humrich ran to assist and grabbed Young's legs while Cancilla hit Young in the face with three "distraction strikes." *Id.* Humrich also adds that the other officers in the residence had sent out 6-8 people from the house while they conducted the probation search. *Id.*

Wutzke's narrative states that he responded to Cancilla's call for assistance with a probation search. Rep. at 10. When he arrived, Officer Luaorozco had Earnest in handcuffs and directed Wutzke to place the man in his patrol car, which Wutzke did. *Id.* He then went to assist the other officers on scene with Young. *Id.* He saw Young lying on his stomach in the front yard of the house, and Cancilla, Weigand, Luaorozco, and Humrich attempting to subdue Young. *Id.* Humrich was trying to gain control of Young's feet, while Weigand and Luaorozco were attempting to gain control of Young's left hand. *Id.* Cancilla was on Young's right side and was commanding him to put his hands behind his back, but Young did not comply. *Id.* Wutzke ran to Young's right side

and grabbed his right forearm. *Id.* He tried to pull Young's right arm out from under his body, but Young clenched it to his chest. *Id.* Wutzke was unsure if anyone else had conducted a weapon search on Young, so he was afraid of Young getting a weapon. *Id.* He grabbed Young's wrist and twisted it for "pain compliance," and was able to bring Young's hand around his back. *Id.* Weigand and Luaorozco were attempting to pull Young's left hand out from under his body, and in the struggle, Wutzke pried open Young's left hand and saw a few small, off-white rocks fall from his left hand and onto his back. *Id.* Once Young was in a seated position, Wutzke saw a metal razor on the ground where Young had just been laying. *Id.*

Luaorozco's narrative states he responded to Cancilla's call for assistance at approximately 12:07 p.m. Rep. at 14. When he arrived, he saw Mendoza holding Earnest at gunpoint. *Id.* Luaorozco handcuffed Earnest and noticed he had dropped money to the ground underneath him. *Id.* Luaorozco picked up the money and later gave it to Cancilla. *Id.* Luaorozco walked Earnest to the front yard and placed him in custody of Wutzke. *Id.* He noticed Cancilla speaking with Young. *Id.* An unspecified amount of time later, he heard a struggle from Cancilla's direction and turned around to see Cancilla and Young on the ground. *Id.* Cancilla was on top of Young, to his right, telling Young to not resist. *Id.* As Luaorozco ran toward the two, the other officers arrived as well. *Id.* Luaorozco took out his baton and pried Young's left arm out from under his body. *Id.* Weigand handcuffed Young. *Id.*

## II. PROCEDURAL BACKGROUND

Young filed this action on March 29, 2018, naming only Cancilla and Humrich in their personal capacities as defendants. [Docket No. 1 (Compl.).] His complaint alleges violations of 42 U.S.C. § 1983, including unlawful arrest, search, and seizure; deprivation of liberty without due process; unlawful discrimination based on race and gender; and violations of equal protection. Compl. ¶¶ 14-18. His complaint also alleges a claim for relief under *Monell*. Compl. ¶¶ 19-23 Finally, he brings state tort claims for conversion, battery, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Compl. ¶¶ 24-38.

//

//

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## IV. ANALYSIS

### A. Claims No Longer at Issue

Plaintiff concedes that he does not have a viable *Monell* claim. [Docket No. 43 (Opp.) at 1.] Plaintiff's *Monell* claim is therefore dismissed with prejudice.

### B. California Tort Claim Act

The court first addresses whether Plaintiff's state law claims against the individual defendants are barred because Plaintiff did not first file a claim under the California Tort Act Claim

7

("CTAC"). *See* Cal. Govt. Code §§ 900 *et seq.* "Under the CTCA, a plaintiff may not maintain an action for damages against a public entity unless a written claim has first been presented to the appropriate entity and has been acted upon by that entity before filing suit in court." *Butler v. Los Angeles Cty.*, 617 F. Supp. 2d 994, 1001 (C.D. Cal. 2008); *see also Boone v. City of Los Angeles*, No. LACV1209301JAKCWX, 2013 WL 12136800, at *4 (C.D. Cal. Sept. 25, 2013) ("Under the CTCA, individuals must file a tort claim within the time, and in the manner, required by statute before filing a lawsuit against any state employee or agency.") (citing Cal. Govt. Code §§ 945.4, 950.2). The government claim must be presented to the public entity no later than six months after the cause of action accrues. Cal. Govt. Code § 911.2.

The CTCA filing requirements must be met even if the state tort claims are paired with a civil rights complaint under section 1983. "Although a plaintiff may include supplemental state law claims in a civil rights action brought in federal court pursuant to 42 U.S.C. § 1983, the state law claims are subject to dismissal for failure to allege compliance with the claim-filing requirement of the CTCA." *Butler*, 617 F. Supp. 2d. at 1001.

Here, Defendants argue that Young failed to comply with the notice requirements of the CTCA and therefore his state tort claims must be dismissed. [Docket No. 41 (Mot.) at 3, 5.] Young does not dispute that he did not file a claim under the CTCA, but argues that the CTCA does not apply because he is suing Defendants in their personal rather than official capacities, and that the CTCA only applies to "public entities." Opp. at 7.

A plaintiff may not avoid the notice requirements of the CTCA merely by bringing an action against public employees in their individual capacities rather than naming the public entity itself. In *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621 (9th Cir. 1988), a plaintiff brought federal civil rights claims (including section 1983 claims) as well as California state tort claims against the City of Los Angeles, the LAPD, and several individual officers. The complaint alleged civil rights violations including unlawful arrest following a confrontation between plaintiff and several Los Angeles police officers. *Id.* at 624. The Ninth Circuit held that the district court properly dismissed the plaintiff's state tort claims, including against the individual defendants sued in their personal capacities, because the plaintiff did not comply with the CTCA procedures. *Id.* at 627.

8

Therefore, the CTCA notice procedures must be followed even when the action is against public employees in their personal capacities.[3]

Accordingly, the court dismisses Young's state tort claims on the basis that he did not comply with the CTCA.

### C. Qualified Immunity

Defendants also move for summary judgment on Young's section 1983 claims on the basis that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id*. A court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (internal quotation marks omitted) (citing *Saucier*, 533 U.S. at 202). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 202.

The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely

---

[3] Some caselaw suggests possible exceptions to the holding in *Karim-Panahi*. *See, e.g.*, *Golden Day Sch., Inc. v. Pirillo*, 118 F. Supp. 2d 1037, 1048 (C.D. Cal. 2000) (finding that a plaintiff need not allege compliance with the CTCA if the public authorities acted outside the scope of their authority). However, none of these arguments are before the court and the court declines to entertain them *sua sponte*.

9

disputed issues of material fact, the court must submit the fact-related issues to the jury." *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008) (noting that where "historical facts material to the qualified immunity determination are in dispute," a jury must decide those facts). "The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

Defendants do not delineate between the various constitutional bases for the section 1983 claims, each of which requires a separate analysis for qualified immunity. They make no attempt to frame or explain the qualified immunity defense for any of the section 1983 claims. As best as the court can tell, there appear to be at least three alleged constitutional violations for which Defendants seek qualified immunity: the initial pat down search of Young; the subsequent arrest of Young; and the force used during the detention and arrest.

### 1. Unlawful Seizure

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment jurisprudence. *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing *Terry*). "The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment." *Erwin*, 803 F.2d at 1508.

"The second tier consists of limited intrusions such as pat-downs of the outer clothing (or 'frisks') and brief investigative detentions. To justify these 'limited' searches and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one." *Id.* During a so-called *Terry* stop, police officers are entitled to employ reasonable measures to protect themselves and others in potentially dangerous situations. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995). However, "[i]nvestigative stops based upon suspicion short of probable cause are . . . constitutionally

10

permissible only where the means utilized are the least intrusive reasonably available." *Kraus v. Pierce Cnty.*, 793 F.2d 1105, 1108 (9th Cir. 1986). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

"The third tier comprises 'full scale' searches or arrests requiring probable cause." *Erwin*, 803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest occurs and probable cause is required.").

### a) Pat Down Search

Defendants argue that Cancilla attempted a pat down search on Young because Young "appeared to be agitated" and was holding a razor blade. Mot. at 8. After Young refused the pat down search, Cancilla and Young had a physical confrontation, other officers appeared to assist Cancilla in placing Young in handcuffs, and Cancilla proceeded with the pat down search of Young. Young Decl. ¶¶ 16-22; Cancilla Decl. ¶¶ 4-6.

Neither party briefs the question of when the detention of Young ripened into an arrest or analyzes the question of qualified immunity based on the different constitutional issues presented by that distinction. *See United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (quoting *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988), *cert. denied*, 490 U.S. 1040 (1989)) (To determine whether a seizure has ripened into a full-scale arrest, the court must consider the "totality of the circumstances."). Even assuming that the pat down search of Young was a *Terry* stop rather than an arrest, the abundance of disputed facts as to material facts precludes a finding of qualified immunity on the claim that the search was unlawful.

Young claims that he handed his straight razor blade to Cancilla while he was still sitting down and posing no threat to the officers, while Cancilla claims that Young was agitated and still holding the razor blade when Cancilla grabbed his wrist. Young Decl. ¶ 15; Cancilla Decl. ¶¶ 4-5. Young further states that he "offered no resistance" while Cancilla kneeled on his spine and Humrich violently twisted his right arm, while Cancilla claims that Young resisted and tried to punch him. Young Decl. ¶ 19; Cancilla Decl. ¶ 5.

11

Each side offers brief, conclusory declarations that contradict each other as to the material facts. The report contains unsworn statements from other officers that do not address whether Young posed any threat to Cancilla to warrant a pat down search. Viewing what little evidence there is in the light most favorable to Young, a reasonable jury could find that Cancilla violated a clearly established constitutional right such that it would be clear to a reasonable officer that his conduct was unlawful in that situation.

Given the disputes of material fact regarding the events leading up to the pat down search, the court denies qualified immunity on this claim.

### b) Arrest

After Young was handcuffed and searched, he was placed under arrest and taken from the scene in a police vehicle. Young ¶ 27; Cancilla ¶ 5. Defendants claim that Young was arrested for possession of crack cocaine that was allegedly found during the pat down search. [Docket No. 47 (Reply) at 2.]

Again, the material facts are in dispute. Young claims that never had crack cocaine on his person. Young Decl. ¶ 25. The officers claim that he did, but their accounts contain conflicting facts. Cancilla states in the police narrative that he saw small, off-white rocks fall from Young's right hand after Young was handcuffed. Rep. at 6. However, in his declaration, Cancilla says that he found the rocks while conducting the pat down search of Young. Cancilla Decl. ¶ 6. Wutzke, in contrast, reports that he pried open Young's left hand while Young was on the ground (before he was handcuffed), and the rocks fell from Young's left hand onto his back. Rep. at 10.

Given these basic factual disputes, the court denies qualified immunity on this claim.

### 2. Excessive Force

Defendants also move for qualified immunity on Young's excessive force claim, arguing that Defendants "only used the amount of force reasonable to place Plaintiff under arrest." Mot. at 8. As discussed above, taken in the light most favorable to Young, a reasonable jury could conclude that Young posed little or no threat to Defendants and accordingly could find that their use of force was not justified under the circumstances. It has long been established that "[f]orce is excessive when it is greater than reasonable under the circumstances," *Santos*, 287 F.3d at 854, and that "where

1  there is no need for force, *any* force used is constitutionally unreasonable." *Fontana v. Haskin*, 262
2  F.3d 871, 880 (9th Cir. 2001).

Accordingly, the court denies Defendants' motion for summary judgment on qualified immunity.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: January 11, 2019



Donna M. Ryu
United States Magistrate Judge